UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KANDLE BUSSEY, and | ) | |
| JESSICA HENSLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 21-CV-0302-CVE-CDL |
| v. | ) | |
| | ) | |
| SUN WEST MORTGAGE COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court are defendant Sun West Mortgage Company, Inc.'s (Sun West) motion for summary judgment (Dkt. # 55) and brief in support (Dkt. # 56), plaintiffs' response (Dkt. # 62), and defendant's reply (Dkt. # 65), as well as defendant's motion in limine to exclude evidence pertaining to alleged hostile work environment (Dkt. # 57). Plaintiffs did not respond to defendant's motion in limine, and the time to do so has expired. This case arises from plaintiffs, former employees of defendant, alleging sex-based discrimination (count 1), hostile work environment (count 2), and retaliation (count 3) under Title VII of the Civil Rights Act of 1964, § 2000e et seq. (Title VII). Dkt. # 29.[1] Defendant moves for summary judgment, arguing that the undisputed facts demonstrate that plaintiffs' sexual harassment/hostile work environment claims fail as a matter of law because, even if the allegations of sexual harassment are true, they "do not rise to the level of severity or frequency required to support a cognizable claim" and, even if they do, defendant is not liable under the circumstances. Dkt. # 56, at 7. Defendant also contends that plaintiffs' remaining

---

[1]     Plaintiffs' initial complaint (Dkt. # 2-1) alleged the same counts as their amended complaint (Dkt. # 29). Plaintiffs' initial hostile work environment claims were dismissed without prejudice in this Court's October 15, 2021, opinion and order, and plaintiffs filed their amended complaint on October 29, 2021 (Dkt. # 29).

claims for discrimination fail because there is no evidence of disparate treatment against them as a result of their gender, and their retaliation claim fails because they cannot establish that they engaged in a protected activity.  Id.  Plaintiffs contends that factual disputes preclude summary judgment on each of their claims.  Dkt. # 62.

## I.

The following facts are undisputed: Sun West is a "non-depository financial institution whose principal business consists of originating and servicing residential mortgage loans throughout the United States."  Dkt. # 56, at 7; Dkt # 62, at 4.  On or about September 30, 2019, Jon Fleege and plaintiffs Kandle Bussey and Jessica Hensley were hired by Sun West "to establish a mortgage lending office in Tulsa, Oklahoma."  Dkt. # 56, at 7; Dkt. # 62, at 4.  Fleege was the "Producing Branch Manager" of Sun West's Tulsa office and was "responsible for soliciting real estate loans for Sun West."  Dkt. # 56, at 8; Dkt. # 62, at 4.  Bussey's job title was "Transaction Coordinator" and Hensley's title was "Loan Officer Assistant."  Dkt. # 62-1; Dkt. # 62-2.  Hensley's offer of employment stated that she would be "[r]eporting [t]o" Fleege, while Bussey's stated that she would be "[r]eporting [t]o" Regan Brown.  Dkt. # 56, at 8; Dkt. # 62, at 5.

Hensley "supported Fleege with placing loans"; Bussey also "provided support for Fleege."  Dkt. # 56, at 8; Dkt. # 62, at 4.  During his deposition, Fleege stated that both Hensley and Bussey were "exclusively [his] support" at Sun West and did not work for any other Sun West branches.  Dkt. # 56-3, at 4.  In her deposition, Bussey confirmed that her day-to-day dealings were more with Hensley than with Fleege, and that Hensley was the one that would "'assign [her] the task [sic] to do when [she] was working at Sun West."  Dkt. # 56-1, at 4.  Hensley stated that, in December 2019, she was told by John Adams, a Sun West employee based in Forth Worth, Texas, who was also at

2

least Hensley's supervisor, that she needed to have Fleege authorize her vacation time, but she also "might call [Human Resources] or email Jeremy Barnes for clarification." Dkt. # 62-3, at 11.

From October 7, 2019 until October 10, 2019, plaintiffs and Fleege "attended Sun West's orientation, training and onboarding session in Forth Worth, Texas." Dkt. # 56, at 8; Dkt. # 62, at 5. On October 7, "they received and signed Sun West's policies prohibiting discrimination, sexual harassment, and retaliation, and initialed every page of the policies," and they "understood that gender was a protected status under the policies." Dkt. # 56, at 8; Dkt. # 62, at 5. The policy they signed and initialed "stated that the company will not tolerate any form of harassment that violates its policies" and it "defined sexual harassment and listed various examples of prohibited conduct which included offensive text messages, offensive physical contact, and offensive images." Dkt. # 56, at 8; Dkt. # 62, at 5. It also "stated that every employee that experienced unwelcome conduct by another employee was expected to inform that person that their conduct is unwelcome." Dkt. # 56, at 8; Dkt. # 62, at 5-6. Further if an employee was "uncomfortable doing so, the employee could contact their supervisor, Human Resources, the chief legal office, the CEO, the COO, or the president of Sun West without fear of retaliation." Dkt. # 56, at 9; Dkt. # 62, at 5-6. Plaintiffs "understood that there were various individuals to whom they could report unwelcome conduct" and both "agree with Sun West's policy statement that Sun West cannot do anything to remedy a problem if it does not know it exists." Dkt. # 56, at 9; Dkt. # 62, at 5-6. The policy also "stated that it forbids retaliation by anyone against an employee who makes a good faith complaint of harassment" and "listed various individuals to whom the employee could report retaliation." Dkt. # 56, at 9; Dkt. # 62, at 6. During the Sun West onboarding, also on October 7, 2019, plaintiffs and Fleege "received and initialed receipt of a flier on communication, which listed a hotline number and

3

a website alert line for employees to use to report any violations, including discrimination and harassment." Dkt. # 56, at 9; Dkt. # 62, at 6.

Plaintiffs allege that "Fleege made unwanted sexual advances towards them during the October 7-10, 2019 Fort Worth trip by physically and inappropriately touching them." Dkt. # 56, at 9; Dkt. # 62, at 6-7. Hensley testified that Fleege took his shirt off in Hensley's hotel room and "was trying to rub [her] feet. He was, . . . grabbing [her] feet to rub them." Dkt. # 62-3, at 7, 8. Bussey "alleges that Fleege touched her inappropriately on October 10, 2019, while at the airport during their return trip back to Tulsa from the Fort Worth training." Dkt. # 56, at 9; Dkt. # 62, at 7. She alleges that Fleege "put his arm around her back and reached all the way around her, 'kind of trying to get his hands on [her] breasts.'" Dkt. # 56, at 9-10; Dkt. # 62, at 7. Then when "they arrived at the Tulsa airport, Bussey drove Fleege home and Fleege sat in the front passenger seat" while "Hensley sat in the rear passenger seat." Dkt. # 56, at 10; Dkt. # 62, at 7. Bussey alleges that while she was driving, Fleege "grabbed her hand and tried to hold it, but she pulled it away" and that Fleege "rubber her leg and 'basically r[an] his hand all the way up and trying to rub [her] vagina.'" Dkt. # 56, at 10; Dkt. # 62, at 7.

"Fleege did not inappropriately touch [plaintiffs] ever again during their employment at Sun West after the Fort Worth Trip." Dkt. # 56, at 9. However, plaintiffs allege that Fleege engaged in other inappropriate behavior after the Fort Worth Trip. Dkt. # 62, at 7. Hensley alleges that Fleege "sent her inappropriate text messages while they worked for Sun West." Dkt. # 56, at 11; Dkt. # 62, at 9. These included "Fleege telling Hensley that he can't leave her alone and wants to hang on her like a little monkey, asking her to lunch, asking her to go furniture browsing for the office, telling her he loves her and apologizing afterwards, telling her he misses her while he's on vacation and

4

says he wants to take her there, and that he has feeling for her and is sorry he's bothering her with this." Dkt. # 56, at 11; Dkt. # 62, at 9.

"Bussey did not report any of the alleged conduct by Fleege she alleges she experienced on the return trip from the Fort Worth onboarding and training."   Dkt. # 56, at 10; Dkt. # 62, at 8. Bussey testified that she did not report it to anyone other than Hensley because she "worked in an office where it was just us three [plaintiffs and Fleege] and [plaintiffs] were [Fleege's] support staff." Dkt. # 62-4. At 3.   She testified that she "felt like if [she] reported and [Fleege] was fired or reprimanded for his behavior, that – one, if he was fired, [she] would no longer have a job" and "two, that if [she] reported and he was reprimanded, in any way, that it would be blatantly obvious that [she reported him].  And that regardless of the company's policy on retaliation, that [Fleege] would treat [her] differently."  Id.

On October 15, 2019, Sun West's Human Resources (HR) "sent an email to all employees, including [p]laintiffs and Fleege regarding Sun West's policy on compliance reporting.  Dkt. # 56, at 10; Dkt. # 62, at 8.  It "reiterated that Sun West is committed to providing a workplace free from discrimination or harassment."  Dkt. # 56, at 10; Dkt. # 62, at 8.  HR "requested that all employees complete the Sun West Compliance reporting form to report any conduct in violation of the policy." Dkt. # 56, at 10; Dkt. # 62, at 8.  "The form contained numerous questions, including whether employees experienced or witnessed inappropriate physical conduct or sexual/offensive comments directed toward them by any other employee." Dkt. # 56, at 10; Dkt. # 62, at 8.  Hensley "completed the form but did not report Fleege's conduct."  Dkt. # 56, at 10; Dkt. # 62, at 8.  Hensley "answered 'No' to questions asking her if she had been physically attacked, assaulted, or experienced any

inappropriate conduct and whether she had experienced or witnessed any violation of company policies such as harassment." Dkt. # 56, at 10; Dkt. # 62, at 8.

On October 22, 2019, "Hensley accepted $2,000[] from Fleege's Sun West sign-on bonus to make up for what she would have been paid had she not left City First," their previous employer. Dkt. # 56, at 11; Dkt. # 62, at 10.  Then on November 14, 2019, Hensley "was arrested and booked in jail for DUI after she was found passed out in her car in someone's driveway." Dkt. # 56, at 11; Dkt. # 62, at 10.  "Fleege and his wife Kara bailed [Hensley] out of jail" and Hensley "thanked the Fleeges for their help." Dkt. # 56, at 11; Dkt. # 62, at 10.  On November 15, 2019, "while Hensley was at home and without a vehicle, she asked Fleege to bring her cake, cookies, or sweets." Dkt. # 56, at 11; Dkt. # 62, at 10.  Fleege "obliged and told her that whatever she wants, he will get." Dkt. # 56, at 11; Dkt. # 62, at 10.  Hensley told Fleege "everything was perfect and thanked him, telling him, '[y]ou're the best.'" Dkt. # 56, at 11; Dkt. # 62, at 10.  Fleege "recommended a criminal attorney to Hensley and she called that attorney." Dkt. # 56, at 11; Dkt. # 62, at 10.  Fleege also "drove Hensley to get her car out of the police impound lot." Dkt. # 56, at 11; Dkt. # 62, at 10.  Fleege testified that defendant was aware of Hensley's DUI but did not find it to be an issue, stating, "people in the mortgage industry are – they go to bars and drink and all that kind of stuff, so it's like it's not like that's taboo or something like that necessarily." Dkt. # 56-3, at 7.

On November 19, 2019, Fleege's wife, Kara, "texted Hensley and told her that she was not happy with the relationship Hensley had with [] Fleege." Dkt. # 56, at 12; Dkt. # 62, at 11.  Kara "did not allege that there was a physical relationship." Dkt. # 56, at 12; Dkt. # 62, at 11.  Hensley responded that she "never thought that anything inappropriate was going on and never thought that anything was being done or said that wouldn't be if you were actually in the room too . . . [.]  I never

6

thought [Fleege] was doing or saying anything towards me [Hensley] that would upset his marriage in any way."  Dkt. # 56, at 12; Dkt. # 62, at 11.

On December 17, 2019, "Hensley texted Fleege about the dirty floors in the office."  Dkt. # 56, at 12; Dkt. # 62, at 12.  "Fleege became angry because he believed Hensley insulted him."  Dkt. # 56, at 12; Dkt. # 62, at 12.  Hensley testified that Fleege "was screaming at [her] on the phone to the point that [she] was reduced to tears."  Dkt. # 56-2, at 10.  Hensley called Regan Brown, another Sun West employee, "to ask if she could work from home the rest of the day because she didn't want to be in the office when Fleege returned."  Dkt. # 56, at 12; Dkt. # 62, at 12.  Hensley testified that at the time she "mistakenly thought that [Brown] was [her] supervisor."  Dkt. # 62-3, at 3.  "Hensley did not recall having any other conversation with Brown about Fleege's conduct."  Dkt. # 56, at 12; Dkt. # 62, at 12.  In that conversation with Brown, Brown advised Hensley that John Adams was her supervisor, and so Hensley "then called Adams."  Dkt. # 56, at 12; Dkt. # 62, at 12.  "Hensley then texted Adams asking him to call her."  Dkt. # 56, at 12; Dkt. # 62, at 12.  Adams called Hensley and she asked him if she could work from home for the rest of the day because Fleege was being a jerk and irrational about the dirty floors," and Adams "gave her permission to work from home."  Dkt. # 56, at 12-13; Dkt. # 62, at 11.

On December 20, "Jeremy Barnes, Fleege, Adams, and [Joe] Gregory were discussing, via email, issues related to Bussey and Hensley, such as tardiness, clocking in and out, and excessive personal and sick days."  Dkt. # 56, at 13; Dkt. # 62, at 13-14.  Hensley testified that she became aware of these "issues that were being brought up about her clocking in and out, keeping track of personal days, tardiness and excessive personal days, [and] sick days in the workplace" by having access to Fleege's email account.  Dkt. # 56-2, at 51, 53.  These emails were exchanged between

10:02 a.m. and 12:05 p.m.," and Hensley "initiated the text message to [] Adams with [her] complaint at 1:54 p.m." that same day.  Dkt. # 56, at 13; Dkt. # 62, at 13-14; Dkt. # 56-2, at 54. Earlier, at 12:02 p.m., Hensley sent Adams an email from Fleege to both plaintiffs in which he was upset about the storage of feminine hygiene products in the office restroom.  Dkt. # 56-12.  At 1:29 p.m. that day, "for the first time, Hensley told Adams about Kara Fleege's texts to her in which Kara stated she was not happy with Hensley's relationship with Jon Fleege."  Dkt. # 56, at 13; Dkt. # 62, at 13-14.  "Hensley did not send Adams any text messages between her and Fleege that contained any alleged sexual harassment messages," and "did not complain in the texts and emails to Adams that Fleege had sexually harassed her or Bussey."  Dkt. # 56, at 13; Dkt. # 62, at 12-13.  However, Hensley testified that during her phone conversation that day with Adams, she raised Fleege's alleged inappropriate text messages, but was cut off before she could say anything about the events that transpired during the Fort Worth trip because Adams "abruptly wanted to stop th[e] conversation that [she] was having about these personal matters to escalate it."  Dkt. # 62-3, at 12, 13.  Adams testified that during these communications with Hensley, he did not think that Hensley ever said that Bussey shared in the concerns, nor did think believe that Bussey's name even came up.  Dkt. # 56-10, at 3-4.  He testified that while Hensley had shared with him that there had been "previous arguments or jealousies or something have to do with [Fleege]'s wife," and "there might have been a previous dust-up at somebody's house where the cops were called," it was also "definitely something [he] didn't want to know about."  Dkt. # 56-8, at 5.  Hensley testified that following her call with Adams she "was with the understanding that, okay HR is going to call [her], an then [she] can go ahead and put everything out on the table, but [she] was fired before [she] was able to have a conversation with HR that [she] thought John [Adams] was initiating."  Dkt. # 62-3, at 12.

On January 8, 2020, Fleege and plaintiffs had a meeting.  Fleege described it as a "Come to Jesus meeting" in which they "cleared the air."  Dkt. # 56-3, at 5.  Bussey testified that during the meeting, Fleege said he had "hated how the [work] environment had become," and there was "so much going on behind the scene[s]" but he also "never really gave [plaintiffs] clear communication on what that meant."  Dkt. # 62-4, at 6.  Hensley alleges that by this point Fleege knew plaintiffs were going to be terminated, so he used that meeting to "wash his hands of any wrongdoing."  Dkt. # 62-3, at 15.  That evening, Fleege texted Hensley that he had "been wanting to talk to [her] for awhile and [that day's meeting between plaintiffs and Fleege] wasn't the way [he] wanted it to go down, but [he was] glad it did."  Dkt. # 56-13, at 1.  He told Hensley that he "do[es]n't hate [her]. Very far from it" and he was "sorry if [he had] given [her] that vibe but [he] feel[s] like the air is clear now" and thanked her "for everything."  Id.  In response, Hensley texted that she "agree[s]" and "apologize[s] that [he] felt that way too."  She continued, texting that she "do[es]n't want to work elsewhere and [she] appreciate[s] what [Fleege] do[es]."  Id.

On January 9, 2020, "[t]he day before plaintiffs were informed of their termination, Joe Gregory, the National Production Manager and manager over the Tulsa office, and Conor Hayhurst, the Vice President of Market Development, traveled from Fort Worth to the Tulsa office for a visit."  Dkt. # 56, at 14; Dkt. # 62, at 14-15.  Fleege testified that Gregory and Hayhurst took him to lunch and asked him if he "could do [his] job with using more support staff at corporate," rather than in the Tulsa office, and Fleege responded that he probably could, but he was trying to grow and could really use the direct support.  Dkt. # 56-3, at 6.  Also on January 9, 2020, Jeremy Barnes, Project Manager, sent an email to HR, John Adams, and Jay Kilpatrick that stated in part that the "anticipated production of [the Tulsa branch] has not materialized and we need to reduce our

operations personnel at this location," and that plaintiffs were the impacted employees.  Dkt. # 56-14, at 1.

"Plaintiffs' employment at Sun West was terminated on January 10, 2020."  Dkt. # 56, at 14; Dkt. # 62, at 17.  Bussey testified that, shortly after her termination, she spoke with Fleege, who told her that Gregory and Hayhurst "asked [him] if [he] had a relationship with [Hensley] and [he] said no."  Dkt. # 62-4, at 7.  She also testified that Fleege said they "asked [him] if there had been inappropriate behavior, [he] said no," and they "asked [him] if [Hensley] had any evidence to the contrary, and [he] told them no."  Id.  Bussey also testified that Fleege told her that Gregory and Hayhurst "indicated to [Fleege] that [plaintiffs] weren't . . . Team Fleege, and that [Hensley] had been reporting things and they felt like it would just be better to let [plaintiffs] go now so that it didn't escalate into something more," and that Bussey was "collateral damage because of what [Hensley] [was] doing."  Id.  Based on what Fleege explained to her, Bussey testified that defendant "didn't want the discussions, that [Hensley] had been having with John Adams, to escalate into anything more and so [defendant] w[as] going to terminated [plaintiffs] based off of a reduction in workforce in order to end the situation with that."  Id.

John Adams testified that either Gregory or Hayhurst informed him of plaintiffs' termination either the day before or the day of their terminations, and that was "also when [he] found out that [they] would be hiring [Fleege's] wife" at the Tulsa branch.  Dkt. # 62-8, at 4.  Adams also testified that he did not recall the Tulsa branch hiring a woman by the name of Arlita Raby; according to his deposition, she was a loan officer assistant at Sun West and Adams did not  think someone in that position "would have rolled up to [him]."  Dkt. # 62-8, at 4.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

Defendant moves for summary judgment on all claims.  First, defendant argues that plaintiffs' hostile work environment claim fails because:  1) Fleege was not plaintiffs' supervisor for Title VII purposes, 2) even if Fleege was their supervisor, his alleged harassment did not culminate in plaintiffs' terminations and defendant can prove an affirmative defense under the Faragher/Ellerth framework, 3) defendant is not liable for Fleege's conduct under a negligence theory, and 4) plaintiffs "have not alleged severe and pervasive harassment that altered their employment, interfered with their performance, or created a subjectively hostile or abusive working environment."  Dkt. # 56, at 15-21.   Second, defendant argues plaintiffs cannot establish a prima facie case of discrimination because they "lack evidence that other similarly situated male employees were treated differently" and defendant produced "legitimate, non-discriminatory reasons for its personnel decisions and plaintiffs have no evidence of pretext."  Dkt. # 56, at 24-27.  Finally, defendant argues plaintiffs' retaliation claim fails because they did not complain to defendant about the alleged harassment or engage in a protected activity.  Dkt. # 56, at 27-30.   Plaintiff argues there are legitimate factual disputes concerning each of defendant's arguments.  Dkt. # 62.  The Court will address each claim in turn.

**A.**

The parties dedicate most of their briefing to plaintiffs' hostile work environment sexual harassment claim.  Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  "[A] plaintiff may establish a violation of Title VII

by proving that discrimination based on sex has created a hostile or abusive work environment."

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  "In such cases, . . . the plaintiff must

show that the work environment was so pervaded by discrimination that the terms and conditions

of employment were altered."  Vance v. Ball State Univ., 570 U.S. 421, 427 (2013) (citing Harris

v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  "Conduct that is not severe or pervasive enough

to create an objectively hostile or abusive work environment—an environment that a reasonable

person would find hostile or abusive—is beyond Title VII's purview.  Likewise, if the victim does

not subjectively perceive the environment to be abusive, the conduct has not actually altered the

conditions of the victim's employment, and there is no Title VII violation."  Harris, 510 U.S. at 21-

22.

"[B]y its nature [there] cannot be[] a mathematically precise test" for finding a hostile work

environment.  Harris, 510 U.S. 17, 22.  The Court explained:

> [W]hether an environment is "hostile" or "abusive" can be determined only by
> looking at all the circumstances. These may include the frequency of the
> discriminatory conduct; its severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and whether it unreasonably interferes
> with an employee's work performance. The effect on the employee's psychological
> well-being is, of course, relevant to determining whether the plaintiff actually found
> the environment abusive. But while psychological harm, like any other relevant
> factor, may be taken into account, no single factor is required.

Id. at 23.  "[T]he severity and pervasiveness evaluation [of a hostile work environment claim] is

particularly unsuited for summary judgment because it is quintessentially a question of fact."

Hernandez v. Valley View Hosp. Ass'n, 684 F.3d 950, 958 (10th Cir. 2012) (alterations in original)

(quotations and citations omitted).

Defendant argues that plaintiffs' sexual harassment hostile work environment claim fails because the alleged harassment was not severe or pervasive enough to alter their employment, interfere with their performance, or create a subjectively hostile or abusive working environment. Dkt. # 56, at 21.   The Court finds that plaintiffs have presented sufficient evidence to show that there is a genuine dispute as to material fact on this question.

Both plaintiffs allege that Fleege made unwelcome physical advances toward them.   Bussey alleges that Fleege tried to grab her breast while they were traveling and then, when she was driving him home at the end of that work trip, he "grabbed her hand and tried to hold it, but she pulled it away" and he "rubbed her leg and 'basically r[an] his hand all the way up and trying to rub [her] vagina.'"   Dkt. # 56, at 10; Dkt. # 62, at 7.   Likewise, Hensley alleges that Fleege made similar advances during that same work trip.   She testified that Fleege took his shirt off in Hensley's hotel room and wanted to rub her feet.   Dkt. # 62-3, at 7.   Hensley also alleges that Fleege "sent her inappropriate text messages while they worked for Sun West."   Dkt. # 56, at 11; Dkt. # 62, at 9.

Defendant argues that Hensley's responses to Fleege's texts and Fleege's wife when she confronted her demonstrates that Hensley was not offended by the text messages.   It argues that "Hensley's actions at the time the text messages were made carry much more credibility" than her subsequent statements in response to defendant's motion or, presumably, during her deposition. Dkt. # 65, at 5.   The Court will not engage in such a credibility assessment at this time.   Hensley's credibility is a factual question for the finder of fact, not something subject to summary judgment as a matter of law.   At this stage of the litigation, it is enough that plaintiffs have raised more than a scintilla of evidence to suggest that plaintiffs were offended by the work environment and that a reasonable person would likewise be offended.   A reasonable jury could find that the alleged physical

harassment was severe conduct, and/or the ongoing text messages to Hensley were sufficiently pervasive, to have fundamentally altered the work environment; therefore, a reasonable jury could find that Fleege's alleged conduct created a hostile work environment.

An employer may be vicariously or directly liable for a hostile workplace. Faragher v. City of Boca Raton, 524 U.S. 775, 806-07 (1998). The applicable theory of liability for such harassment depends on the status of the harasser. Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). Generally, an employer is directly liable when the harasser is a co-worker of the plaintiff and the employer was negligent with respect to the offensive behavior. Id. at 427. However, "different rules apply where the harassing employee is the plaintiff's 'supervisor.' In those instances, an employer may be vicariously liable for its employees' creation of a hostile work environment." Id. at 428 (emphasis in original). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." Id. at 424. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Therefore, "whether the harasser was a 'supervisor' within the meaning of Title VII is a critical threshold question in determining whether the employer can be held vicariously liable for the harassment." Kramer v. Wasatch Cnty. Sheriff's Off., 743 F.3d 726, 737 (10th Cir. 2014).

A "supervisor" under Title VII is an employee whom "the employer has empowered . . . to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits.'" Vance, 570 U.S. at 431 (quoting Ellerth, 524 U.S. at 761). However, "an employee need not be empowered to take such tangible employment actions directly to qualify as a supervisor. A manager who works closely with his or her subordinates and who has the power to recommend or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII." Kramer, 743 F.3d at 738 (citation omitted); see also Vance, 570 U.S. at 447 ("If an employer does attempt to confine decision making power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee. . . . Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies.).

Defendant argues that Fleege was not plaintiffs' supervisor for the purposes of Title VII. It argues that Fleege "had no authority to hire, fire, promote, or demote" plaintiffs, "[n]or could Fleege reassign them with significantly different responsibilities and make decisions causing a significant change in benefits." Dkt. # 56, at 16. However, it offers no citations to support these assertions, and they are not supported by the submitted portions of the record.[2] Instead, the record reflects that

---

[2]     Defendant asserts that "Sun West management advised Fleege that he was not [plaintiffs'] direct supervisor under the structure of Sun West." Dkt. # 56, at 12. Defendant cites to pages 27, 28, and 29 of Fleege's deposition testimony to support this claim; however, neither defendant nor plaintiffs provided the Court with these pages and so the Court can make no findings about this supposed interaction. Even if the parties included these transcript pages and they support defendant's assertion, it would not change the result because whether Fleege was plaintiffs' "direct supervisor" says nothing about his status as a "supervisor" under Title VII. One need not be a "direct supervisor" to qualify as an employee empowered to take tangible employment actions.

Hensley's offer of employment states that she would "[r]eport[] [t]o" Fleege, Dkt. # 62-1, and she and Bussey always worked under him and supported him only and no other Sun West offices.  Dkt. # 56-2, at 3-4, 5, 16.  In addition, Hensley testified that when she sought guidance about who approves her vacation time, John Adams advised her that Fleege had to approve her vacation time.  Dkt. # 62-3, at 11.  The authority to approve vacation time has a direct economic impact for the employee, and so can demonstrate the authority to take tangible employment actions.  Further, Fleege testified that during the January 9, 2020, meeting with Gregory and Hayhurst, they asked for his input on whether he could do his job using "support staff at corporate."  Dkt. # 56-3, at 6.  He responded that though he preferred direct support in his local office, he believed he probably could do his job using support staff outside of his office.  Id.  Plaintiffs were terminated the following day.  A reasonable jury could interpret these facts to support a finding that Fleege had the authority to take tangible employment actions, including directly by authorizing vacation time or indirectly by providing information on which defendant would have to rely in making those tangible employment decisions, against plaintiffs.

Defendant also argues that Fleege lacked the necessary Title VII supervisory authority because, "Gregory, . . . Hayhurst, and Jeremy Barnes made the decision to terminate [p]laintiffs' employment and Fleege could not override the decision despite his attempt to do so."  Dkt. # 56, at 16.  However, the fact that Fleege could not impact the decision to terminate plaintiffs under these circumstances, in which plaintiffs presented evidence that defendant had some notice of improper or problematic behavior involving Fleege and at least one of the plaintiffs, does not mean that he did not have the authority to impact these personnel decisions more generally, or have other tangible effects on their employment, as discussed above.

Defendant also emphasizes the fact that plaintiffs had other supervisors at Sun West, including John Adams and Regan Brown, as evidence that Fleege was not their supervisor. However, whether plaintiffs had other supervisors has no bearing on whether Fleege was also their supervisor. Employees often have multiple supervisors for the purpose of Title VII, in that multiple people may be empowered by the employer to take tangible employment actions against the plaintiffs. Therefore, while defendant has demonstrated that plaintiffs' supervisors likely included John Adams and/or Regan Brown, there remains a genuine dispute as to material fact as to whether Fleege was also plaintiffs' supervisor under Title VII. This factual dispute precludes the granting of summary judgment on plaintiffs' hostile work environment sexual harassment claim. As the material factual dispute as to the Fleege's status as a supervisor or co-worker under Title VII precludes summary judgment on this issue, the Court need not address defendant's the other arguments concerning defendant's potential liability based on Fleege's status.

**B.**

Next, defendant argues that plaintiffs cannot establish a prima facie case of gender discrimination because there is no evidence that "other similarly situated male employees were treated differently" and, even if there is, plaintiffs have no evidence that defendant's stated rationale for their termination was pretextual. Dkt. # 56, at 25-27. Plaintiffs argue that they made a prima facie case of discrimination because the female plaintiffs were treated differently than Fleege, the male employee, with respect to discipline and retention, and that they produced evidence of pretext, creating a factual dispute which precludes summary judgment. Dkt. # 62, at 21.

Under Title VII, it is unlawful "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

18

because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove a Title VII violation through either direct or circumstantial evidence. See Furr v. AT & T Techs., Inc., 824 F.2d 1537, 1548-49 (10th Cir. 1987). If the plaintiff proceeds by means of circumstantial evidence, the Tenth Circuit has explained the burden-shifting framework applicable to such claims as follows:

> Under the McDonnell Douglas framework, the plaintiff must carry the initial burden under the statute of establishing a prima facie case of [discrimination or retaliation]. Once the plaintiff has established a prima facie case, [t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment action. If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (internal quotation marks and citations omitted). To state a prima facie case of discrimination under Title VII, a plaintiff must allege: (1) that the victim belongs to a protected class; (2) that the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007). "One method by which a plaintiff can demonstrate an inference of discrimination is to show that the employer treated similarly situated employees more favorably." Luster v. Vilsack, 667 F.3d 1089, 1095 (10th Cir. 2011).

The Court finds that plaintiffs have presented evidence to support that their terminations took place under circumstances that give rise to an inference of discrimination because Fleege, a similarly situated employee, was treated more favorably than plaintiffs. Hensley complained about Fleege to John Adams. According to her testimony, texts, and emails, the complaint included issues involving Fleege and both plaintiffs. Approximately twenty days later, Joe Gregory, the National Production

Manager and manager over the Tulsa office, and Conor Hayhurst, the Vice President of Market Development, traveled to Tulsa and met with Fleege, and plaintiffs were terminated the following day.  Dkt. # 56, at 14; Dkt. # 62, at 14-15.  Fleege testified that Gregory and Hayhurst took him to lunch that day and sought Fleege's input on whether he "could do [his] job with using more support staff at corporate," rather than in the Tulsa office, and Fleege responded that he probably could, but he was trying to grow and could really use the direct support.  Dkt. # 56-3, at 6.  Bussey also testified that Fleege said he was asked whether he had a relationship with Hensley and could prove that he did not have an inappropriate relationship with her, but he could not, and Bussey was "collateral damage" because of it.  Dkt. # 62-4, at 7.  There is no evidence that Gregory and Hayhurst had any similar conversations with plaintiffs.  Based on this evidence, a reasonable jury could find that plaintiffs and Fleege were are similarly situated employees in that they worked under Gregory and Hayhurst, who controlled the Tulsa office, including personnel decisions.  The finder of fact could also determine that defendant was on notice as to at least some issues between plaintiffs and Fleege, including a potentially inappropriate relationship, and chose to terminate Hensley and Bussey, the female employees, but not Fleege, the male employee.  These circumstances may give rise to an inference of discrimination, and supports a prima facie case of gender discrimination under Title VII.

Sun West claims it "terminated [p]laintiffs' employment after it determined that the anticipated production of the Tulsa branch did not materialize, and therefore, Sun West needed to reduce its operations personnel in Tulsa."  Dkt. # 56, at 26.  Defendant argues that it produced "legitimate, non-discriminatory reasons for its personnel decisions, and [p]laintiffs have no evidence of pretext."  Dkt. # 56, at 26.  The Court disagrees.  The evidence concerning Gregory and Hayhurst's conversations with Fleege, along with the proximity between Hensley's initial complaint

and plaintiffs' terminations, is evidence of pretext.  In addition, Bussey testified that defendant was continuously investing into building the physical presence of the Tulsa office and also the fact that Fleege and plaintiffs "had closed more files in the time frame that [they] had been at Sun West than [they] had at City First."  Dkt. # 62-4, at 6.  She also testified that in December 2019 she had positive conversations with John Adams in which Adams "thought that [Bussey] would do well in [an official processor role] and [defendant] would be willing to provide additional training to get [her] there." Id,  Further, after plaintiffs were terminated, defendant hired Fleege's wife and Arlita Raby in the Tulsa branch, and Raby's title of loan officer assistant is the same title Hensley had.  Compare Dkt. # 62-1, at 2 (listing Hensley's position as "Loan Officer Assistant"), with Dkt. # 62-8, at 4 (referring to "Arlita Raby, loan officer assistant at Sun West Mortgage").  A reasonable jury could find this evidence supports a conclusion that defendant's rationale for terminating plaintiffs' employment was pretextual.  Plaintiffs have satisfied their burden at this stage of the litigation and, therefore, the Court denies summary judgment on the gender discrimination claim.

## C.

Finally, defendant argues that plaintiffs have failed to support a claim for retaliation because they failed to produce evidence that they engaged in a protected activity under Title VII.  Dkt. # 56, at 27-30.  Plaintiffs respond that Hensley's initial report to Adams on December 20, 2019 constitutes protected activity.  Dkt. # 62, at 21.

Under Title VII, an employer may not retaliate against an employee for engaging in protected activity.  To make a prima facie case of retaliation, an employee must show "(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected

activity and the materially adverse action." <u>Somoza v. University of Denver</u>, 513 F. 3d 1206, 1212 (10th Cir. 2008). Title VII provides two separate ways in which an employee can engage in protected activity for the purpose of a retaliation claim. Under the "participation clause," an employer may not retaliate against an employee "'because [the employee] has . . . participated in any manner in an investigation, proceeding, or hearing under' Title VII." <u>Vaughn v. Epworth Villa</u>, 537 F.3d 1147, 1151 (10th Cir. 2008). The participation clause protects an employee in providing information as part of a formal investigation by the EEOC and it does not apply to participation in an internal investigation by the employer. <u>EEOC v. Rite Way Serv., Inc.</u>, 819 F.3d 235, 239 n.2 (5th Cir. 2016); <u>Townsend v. Benjamin Enter, Inc.</u>, 679 F.3d 41, 48-49 (2d Cir. 2012); <u>Hatmaker v. Mem'l Med. Ctr.</u>, 619 F.3d 741, 747 (7th Cir. 2010). The "opposition clause" protects an employee who has opposed any practice that is made unlawful under Title VII. <u>Id.</u> A plaintiff is not required to show that she reported an actual violation of Title VII, but protected activity occurs when an a plaintiff shows a "'reasonable good-faith belief that' she was opposing discrimination." <u>Fassbender v. Correct Care Solutions, LLC</u>, 890 F.3d 875, 891 (10th Cir. 2018).

Defendant disputes that plaintiffs engaged in protected activity. Bussey complained about the alleged harassment to Hensley only. Hensley testified that her complaint to Adams did not include Bussey's allegations of sexual harassment, and Bussey testified that she did not believe anybody ever mentioned to anybody at Sun West that she had been the subject of sexual harassment. Dkt. # 62-3, at 12; Dkt. # 62-4, at 5. Therefore, Bussey has not proffered any evidence that she had a reasonable good faith belief that she was opposing the alleged discrimination. As she has presented no evidence to suggest that she engaged in any protected activity, as required to make a <u>prima facie</u> case of retaliation, Bussey's retaliation claim should be dismissed.

Hensley, however, testified that when she initiated her complaint with Adams, which she said included information about Fleege's texts, Adams "abruptly wanted to stop th[e] conversation . . . about these personal matters to escalate it, and so [she] was with the understanding that, okay HR is going to call [her], an then [she] can go ahead and put everything out on the table, but [she] was fired before [she] was able to have a conversation with HR that [she] thought John [Adams] was initiating." Dkt. # 62-3, at 12. Therefore, Hensley has presented evidence showing a reasonable good faith belief that she was opposing the alleged discrimination that she faced.  Hensley's initial complaint did not state the extent of the allegedly unlawful practices under Title VII at issue in this case, but she need not show that she reported the actual alleged violations of Title VII.  She must show only a reasonable good-faith belief that she was opposing discrimination.  A reasonable jury could find that her initial complaint to Adams provided a reasonable good-faith belief that she was opposing discrimination.  As such, Hensley has proffered evidence in support of her retaliation claim and, therefore, summary judgment is precluded.

Next, defendant argues that Hensley, as the plaintiff who can make a prima facie retaliation claim, "cannot prove" that her termination (the alleged adverse employment action) was a "result of [her] alleged sexual harassment complaint."  Dkt. # 56, at 27.  Once again, defendant is mistaken as to Hensley's burden at this stage of the litigation.  As the nonmovant, Hensley need only proffer evidence showing there is a genuine dispute of material fact as to whether her termination was the result of her protected activity.  She has presented that evidence.  The temporal proximity between Hensley's complaint to Adams on December 20, 2019, and the subsequent terminations on January 10, 2020, combined with Bussey's testimony that Fleege told her that she and Hensley were fired because they were not "Team Fleege" and management's feeling that "it would just be better to let

[plaintiffs] go now so that it didn't escalate into something more," Dkt. # 62-4, at 7, as well as Hensley's testimony that Adams cut off the conversation before she shared details of the Fort Worth trip, Dkt. # 62-3, at 12, and Adams' testimony that he "definitely . . . didn't want to know about" the "personal" issues Hensley had raised to him, Dkt. # 62-8, at 5, raise a genuine dispute of material fact as to whether Hensley was terminated as a result of her alleged sexual harassment complaint. Based on the evidence in the record, a reasonable jury could conclude that defendant terminated Hensley as a result of her complaint.  Therefore, summary judgment must be denied as to Hensley's retaliation claim.

## IV.

Defendant also filed a "contingent [m]otion in [l]imine to exclude evidence pertaining to [p]laintiffs' allegations of sexual harassment and hostile work environment in the event [p]laintiffs' sexual harassment/hostile work environment causes of actions are dismissed pursuant to" its motion for summary judgment.  Dkt. # 57, at 1.  As plaintiffs' sexual harassment/hostile work environment claims are not dismissed, defendant's motion in limine concerning the relevance of evidence related to those claims is moot.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 55) is **granted in part and denied in part**:  it is **granted** as to Bussey's retaliation claim only; it is **denied** as to all other claims.

**IT IS FURTHER ORDERED** that defendant's motion in limine to exclude evidence pertaining to alleged hostile work environment (Dkt. # 57) is **denied as moot.**

**DATED** this 31st day of August, 2023.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE